UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| | | |
|---|---|---|
| DANA GAIL HIBBS | ) | |
|     Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 1:04-CV-204 |
| | ) | |
| RUBEN ANTONIO HERNANDEZ, | ) | |
| Individually and as Agent for JOSE R. | ) | Judge Carter |
| HERNANDEZ; and RUBEN ANTONIO | ) | |
| HERNANDEZ and JOSE R. HERNANDEZ, | ) | |
| Individually and as Agents for EAGLE | ) | |
| CARPORT, INC.; and EAGLE CARPORT, | ) | |
| INC., through its agents, RUBEN ANTONIO | ) | |
| HERNANDEZ and JOSE R. HERNANDEZ, | ) | |
|     Defendants. | ) | |

_____

MEMORANDUM
_____

I. Introduction

This action arises from an automobile collision occurring on April 23, 2004. Defendant Eagle Carport, Inc., (Eagle) has moved for summary judgment on plaintiff's claim of vicarious liability on the ground that the two individual defendants were independent contractors, not employees, of Eagle. (Doc. 8). Since Eagle's motion for summary judgment did not address the plaintiff's claim of negligent entrustment, Eagle's motion is one for partial summary judgment. For the reasons stated herein, Eagle's motion for partial summary judgment shall be GRANTED. The plaintiff's claim against Eagle for negligent entrustment remains.

II. Standard of Review

FED. R. CIV. P. 56(c) provides that summary judgment will be rendered if there is no

1

genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. The burden is on the moving party to conclusively show that no genuine issue of material fact exists, and the Court must view the facts and all inferences to be drawn therefrom in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 475, 587 (1986); *Stratienko v. Cordis Corp.*, 429 F.3d 592, 597 (6th Cir. 2005); *Morris v. Crete Carrier Corp.*, 105 F.3d 279, 280-81 (6th Cir. 1997); *White v. Turfway Park Racing Ass'n, Inc.*, 909 F.2d 941, 943 (6th Cir. 1990); *60 Ivy Street Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir. 1987). Once the moving party presents evidence sufficient to support a motion under Rule 56, the nonmoving party is not entitled to a trial merely on the basis of allegations. To avoid summary judgment, the nonmoving party is required to come forward with some significant probative evidence which makes it necessary to resolve the factual dispute at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); *Stratienko*, 429 F.3d at 597; *White*, 909 F.2d at 943-44; *60 Ivy Street*, 822 F.2d at 1435. The court cannot weigh the evidence or determine the truth of any matter disputed. *Anderson v. Liberty Lobby, Inc.* 477 U.S. 242 (1986); *Stratienko*, 429 F.3d at 597. The Court determines only whether there is sufficient evidence to allow a jury to reasonably find for the nonmoving party. *Anderson*, 477 U.S. at 248-49; *Stratienko*, 429 F.3d at 597. The moving party is entitled to summary judgment if the nonmoving party fails to make a sufficient showing on an essential element of the nonmoving party's case with respect to which the nonmoving party has the burden of proof. *Celotex*, 477 U.S. at 323; *Collyer v. Darling*, 98 F.3d 211, 220 (6th Cir. 1996).

III. Relevant Facts

Eagle filed an affidavit of Alicia Torres (Doc. 9-2) in support of its motion for summary judgment. This affidavit was sufficient to shift the burden to produce evidence to the nonmoving parties. The nonmoving parties have responded by producing deposition testimony and various other exhibits. The Court has relied on this evidence produced by the nonmoving parties, considering it in the light most favorable to the nonmoving parties, in determining that summary judgment on the plaintiff's claim of vicarious liability against Eagle is appropriate. It is appropriate for the Court to rely upon evidence produced by the nonmoving parties in granting summary judgment as the Court "consider[s] *all* evidence" when ruling on a motion for summary judgment. *Old Life Ins. Co. of America v. Garcia*, 411 F.3d 605, 610 (6th Cir. 2005) (emphasis added); *see also* Fed. R. Civ. P. 56(c) (Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.") Finally, the Court also notes that it has carefully read the deposition testimony submitted by the nonmoving parties and finds that this testimony does not support the version of facts propounded by the nonmoving parties.

Based on the aforementioned evidence, the relevant facts are these:

Alicia Torres is the vice president and her husband, Gabriel, is the president of Eagle. Tim Gammons is Eagle's General Manager, and Vickie Collins is Eagle's Assistant Controller. Eagle, with its main office in Cana, Virginia, manufactures metal buildings at four different locations throughout the United States (Torres Deposition at pp. 11-13, hereinafter cited as "Torres at __"). These four locations are Dickson, Tennessee; Nacogdoches, Texas; Cloves,

3

New Mexico; and Cana, Virginia (Torres at 10).  Eagle employs three or four sales persons who cover the dealer areas (Torres at 16-19).  Eagle's dealers are primarily car dealerships located in approximately thirty states (Torres at 14-16).  The dealers take orders for the carports and fax or phone the orders to the primary office in Cana, Virginia (Vickie Collins deposition at p. 11, hereinafter cited as "Collins at __").  The dealers receive a ten percent up front commission when the customer signs the contract to purchase the carport from Eagle (Torres at 24).  The remaining balance is collected by Eagle at installation by the installers (Torres at 42).  Secretaries at the primary office take the orders for the carports.  When receiving the orders, they enter the orders into the computer (Torres at 11, 28).  When the secretaries receive eight to ten orders for a particular area, they schedule a "run" (Torres at 30-31).  The secretary does not tell the customer the exact day or time that the installers will come but tells them the week they can expect installation (Torres at 30).  Installation crews will call in and inform Eagle that they will be working a specific week (Torres at 48).  The crews can and do work for different companies besides Eagle (Torres at 48).  Installation crews are selected based on their availability for the week installation is scheduled (Torres at 47-48) (Collins at 14).  Sometimes Eagle calls the installer and asks if he can work on a particular date.  Sometimes he can, sometimes he can't (Collins at 14).  Installation times are sometimes changed based on the installer's schedule (Torres at 30). Eagle has between thirty-five and forty installers nationwide (Timothy Gammons deposition at p. 24, hereinafter cited as Gammons at __).  Eagle supplies the installer with all the materials constituting the carport at the manufacturing location.  In addition, the installation crew is reimbursed for any materials it purchased to replace missing or damaged parts during the installation process (Collins at 23, Gammons at 15).  Eagle installers receive a percentage of the

4

invoice. The percentage may be 15, 18, or 20 percent depending on the distance of the work site from the manufacturing location (Torres at 44-45). Eagle has no requirement concerning the number of installers per crew on each installation job. Carport materials are transported on a trailer custom manufactured to carry the specially sized carport materials. Installers must have their own vehicle to pull the trailer. Installer must also pay for their own vehicle insurance and gasoline (Torres at 44, 71-72). Installers often have their own trailers to pull the carport materials, but if they do not, Eagle has trailers available on site for purchase. Eagle also allows contractors to use their trailers without purchasing them to haul carport materials (Gammons at 19-20). The installer provides his own tools for installation (Gammons at 19-20). According to Tim Gammons, people who are interested in installing Eagle carports come to the manufacturing location to talk to the shop foreman. If the shop foreman thinks that person would make a good installer, he recommends them to Gammons as an acceptable installer (Gammons at 7). If the shop foreman recommends an installer, he is hired (Gammons at 8). The shop foreman is supposed to obtain a copy of the installer's vehicle insurance, a driver's license, social security number, and DOT numbers (Gammons at 8). If the installer has previous experience with another company in a similar line of work, no training is provided. However, if the installer needs some training, he works with another installation crew for another week or two (Gammons at 24-25, Torres at 30-39). Neither the crew that is doing the training nor the crew that is being trained receives any remuneration for this training. Once an installation crew has been given a "run," they are provided with a copy of the contract between the customer and Eagle. This contract will also provide written directions to the customer's house (Gammons at 31-32). No additional instructions are given to the installers as to how to install the carports (Torres at 40).

5

Case 1:04-cv-00204   Document 68   Filed 02/17/06   Page 5 of 15   PageID #: 68

The installer determines if the site where the carport is to rest is level enough for installation. If the installer, in his judgment, determines that the site is inappropriate, he has the discretion to either select a new site on the customer's property or to leave without completing the job (Torres at 37-38). Installers are not paid at regular intervals. Rather, they are paid when they return to the shop from a particular installation run (Torres at 45).

On April 23, 2004, defendant Ruben Antonio Hernandez was driving a 2001 Ford F-350 pick-up truck owned by defendant Jose Ruben Hernandez on Tennessee State Road 156. The pick-up truck was hauling a trailer registered to Eagle (*See* Police Report, Doc. No. 37-2, Torres at 97). Jose Ruben Hernandez and Lewis Castillo were passengers in the truck. *(See* Police Report, Doc. No. 37-2). The men were returning from a work site where they had installed a carport manufactured by Eagle. (*See* David Swiatowy Affidavit, Doc. 37-3). As Plaintiff Dana Hibbs was driving around a curve on State Road 156, she came upon the pickup truck with trailer driven by Ruben Antonio Hernandez. It was stopped in her lane. She braked but was unable to avoid a collision. (Dana Hibbs deposition at 42-46). Plaintiff suffered injuries as a result of the incident (Complaint).

Defendants Jose Ruben Hernandez and Ruben Antonio Hernandez are approved installers for Eagle, but Mr. Gammons has never heard of Lewis Castillo (Gammons at 22-23). In her deposition, Ms. Collins testified the name "Lewis Castillo" was "familiar," but she could not recall "exactly who it is." (Collins at 37-38). Eagle asserts that defendant Jose Ruben Hernandez was in the process of purchasing the trailer that Dana Hibbs hit; however, Eagle has been unable to produce any written documentation to verify this assertion (Collins at 15, 34; Gammons at 35). In 2003, Ruben Antonio Hernandez received $119,529.80 from Eagle.

6

(Torres at 80). This income was reported on a 2003 1099 form. (Torres at 80). There have been no documents produced to show that he worked for other companies during this period of time (Torres at 80, 74). Eagle did not withhold Social Security or federal income taxes for the individual defendants. (Collins at 8-9; *See* 1099 Form and W-9 Form, Doc. 36-5). Eagle did report in 2004 $44,773.23 of income to a "Ruben Hernandez" on a 1099 form. (Doc. 36-5).

## IV. Analysis

### *A. Negligent Entrustment*

There appears to be some confusion about whether Eagle has moved for summary judgment on plaintiff's claim for negligent entrustment. In her response to Eagle's motion for summary judgment, the plaintiff asserts that her claim against Eagle for negligent entrustment of Eagle's trailer to Ruben Antonio Hernandez should withstand Eagle's motion for summary judgment, at least in part, because Ruben Antonio Hernandez who was driving the truck pulling the trailer had no valid driver's license. The undersigned agrees that the negligent entrustment claim survives Eagle's motion for summary judgment but for a different reason: Eagle did not move for summary judgment on the negligent entrustment claim.

The first time Eagle mentioned the plaintiff's claim of negligent entrustment was in its reply brief, an insufficient effort to raise the issue for this court's review. *See United States v. Dairy Farmers of America, Inc.*, 426 F.3d 850, 856 (6th Cir. 2005) (mention of an issue in a footnote in the supporting brief of a motion for summary judgment and inclusion of the issue in a reply brief is insufficient to raise the issue for judicial review); *Sundberg v. Keller Ladder*, 189 F. Supp 671, 682-83 (E.D. Mich. 2002) (refusing to consider an issue raised by a movant for summary judgment the first time in a reply brief, the court stated, "it is not the office of a reply

7

brief to raise issues for the first time"); *Books A Million v. H & N Enterprises, Inc.*, 140 F. Supp.2d 846, 851 (S.D. Ohio 2001) ("it is improper for the Plaintiff to address three affirmative defenses for the first time in its reply Memorandum.") Thus Eagle did not properly move for summary judgment on the negligent entrustment claim. Furthermore, a negligent entrustment claim is separate and distinct from a vicarious liability claim based on the doctrine of respondeat superior. *Ali v. Fisher*, 145 S.W,3d 557, 564 (Tenn. 2004) ("The act of negligent entrustment and the act of negligent operation of a vehicle are separate and distinct.") The focus of a negligent entrustment claim is on the entrustor's alleged negligence in loaning or selling chattel to the entrustee, not on the entrustee's alleged negligence. *Id.* ("The tort of negligent entrustment is committed when control of the entrusted chattel is relinquished by the entrustor to a person the entrustor knows to be incompetent to use it," and "we hold that negligent entrustment does not create vicarious liability.") Conversely, under the doctrine of respondeat superior, the focus is on the employee's alleged negligence for which the employer can be held vicariously liable. *See e.g.*, *Shelburne v. Frontier Health*, 126 S.W.3d 838, 845 (Tenn. 2003) (hospital could be held vicariously liable under doctrine of respondeat superior for negligence of its employee). Thus, because liability in a negligent entrustment claim hinges on the conduct of the entrustor, it is immaterial whether the entrustee is an employee or an independent contractor. In summation, the Court concludes Eagle did not properly raise the issue of the plaintiff's negligent entrustment claim, and therefore the claim remains.

### B. Respondeat Superior Liability

Eagle moves for summary judgment on the plaintiff's claim for vicarious liability on the ground that Ruben Antonio Hernandez was an independent contractor, not an Eagle employee

and, accordingly, Eagle cannot be held liable under the doctrine of respondeat superior for Ruben Antonio Hernandez's negligence. "The doctrine of respondeat superior serves to make an employer ... vicariously liable for torts committed by its employee when that employee was acting within the scope of his employment." *Russell v. City of Memphis*, 106 S.W. 3d 655, 657 (Tenn. Ct. App. 2002); *accord, Thurmon v. Sellers*, 62 S.W.2d 145, 153 (Tenn. Ct. App. 2001). Where, however, a worker is an independent contractor as opposed to an employee, the principal is generally not held vicariously liable for the negligent acts of the independent contractor. *Givens v. Mullikin ex rel. Estate of McElwaney*, 75 S.W. 3d 383, 394 (Tenn. 2002);[1] *see also, Wilson v. Thompson Const. Co.*, 86 S.W.3d 536 (Tenn. Ct. App. 2001).

Indicia a court should consider when determining whether a worker is an employee or independent contractor are 1) the right to control the conduct of the work, 2) the right of termination, 3) the method of payment, 4) the freedom to select and hire workers, 5) the furnishing of tools and equipment, 6) self-scheduling of work hours, and 7) being free to render services to other entities. *Bargery v. Obion Grain Co.,* 785 S.W.2d 118, 119-20 (Tenn. 1990); *Wright v. Knox Vinyl & Aluminum Co., Inc.*, 779 S.W. 2d 371, 373 (Tenn. 1989); *Maisers v. Arrow Transfer & Storage Co.*, 639 S.W. 2d 654, 656 (Tenn. 1982).

"[A]lthough no indicia is infallible or entirely indicative, it has generally been recognized by this court that the primary test for determining a claimant's status as employee or independent contractor is the right to control." *Maisers*, 639 S.W.2d at 656 (internal citations omitted); *see also Bargery*, 785 S.W.2d at 120 ("while all factors are important, the 'right to

---

[1] While the Tennessee Supreme Court stated in *Givens* that there are "some twenty-four exceptions" to the general rule, *Givens*, 75 S.W.3d at 394, the plaintiff has raised none in this case.

9

control' is the primary test"); *Wright*, 779 S.W.2d at 373 (same).  The more control the principal/master has over the details and methods of the worker's labor, the more likely it is that the employer-employee status exists.  *Id.*  However, "a party to a contract can exercise direction and control over the results of the work without destroying the independence of the contract or creating an employer-employee relationship."  *Maisers*, 639 S.W.2d at 656; *see also, Wright*, 779 S.W.2d at 373; *Bargery,* 785 S.W.2d at 120.

*The Right To Control*

The evidence produced in the form of Alicia Torres,' Vickie Collins,' and Timothy Gammons' respective depositions indicates Eagle had very little control over the details and methods of installers' work.  If the installers came to Eagle with previous experience setting up carports, there was no training.  If an installer had no previous experience, the installer was sent to work with another crew for a week or two.  After working with another crew and when the installer was given a job, he loaded the trailer with the carport materials and then drove to the site where the carport was to be assembled.  No Eagle personnel were present to give instructions or to inspect the installation.   The installers were given the discretion to determine whether the site selected by the customer was of sufficient size and level enough.  If not, the installer made the decision to halt installation.  The installer also made his own decisions about whether other materials were needed, and if so, the installer made the decision as to what extra materials were needed and bought them.

*The Right to Terminate*

Another factor which has also gained important significance in determining the status of a worker is the right of termination.  *Maisers*, 639 S.W.2d at 656; *Boruff v. CNA Ins. Co.*, 705

10

S.W. 2d 125, 127 (Tenn. 1990). Where a party to a contract retains the power to terminate the contract at will, such an arrangement is more indicative of an employee status than an independent contractor status. *Id.*

Neither party has produced evidence specifically directed toward the question of the respective parties' rights in regard to termination. However, as a practical matter, the evidence is unequivocal that once the installer picked up the carport materials at the Eagle facility, he did not have contact with Eagle until he returned to the shop to pick-up more materials. The strong inference is that decisions to hire and fire were made on an installation by installation basis.

*The Method of Payment*

Installers including Ruben Antonio Hernandez were not paid at regular time intervals, rather they were paid a percentage of each installation, the percentage varying at set levels depending upon the distance of the job from Eagle's manufacturing site. Furthermore, the same fee was paid regardless of the number of people working on the installation crew. This method of payment, a set amount per job, is indicative of an independent contractor, not an employee. *See Wright*, 779 S.W.2d at 374 (method of payment for siding installer, a flat fee based on the amount of siding installed, was "indicative of a contractor-contractee relationship") *see also*, *Bargery*, 785 S.W.2d at 119 (truck driver/independent contractor paid set amount per bushel of grain hauled); *Beare Co.*, 814 S.W.2d at 716-18 (warehouse workers/independent contractors paid according to the weight of the food product they unloaded). Moreover, Eagle reported payments to Ruben Antonio Hernandez on a 1099 Form which is used to report payments other than wages. Eagle also did not pay social security taxes for Ruben Antonio Hernandez. Both of these facts are indicators of independent contractor status.

11

*The Freedom to Select and Hire Workers*

There was no evidence presented to the Court concerning whether installers *in general* could hire or select their own crew. There was testimony from both Torres and Gammons that the installers are essentially selected by the shop foreman in a fairly informal process whereby prospective installers come by to speak with the shop foreman about their experience and desire to work. The foreman then decides if the person would make a good installer and Gammons and Torres act according to this recommendation.

There were three men on the installation crew involved in the accident with Ms. Hibbs: Ruben Antonio Hernandez, Jose Ruben Hernandez, and Lewis Castillo. In her original affidavit, Alicia Torres stated that Eagle had contracted with Jose Ruben Hernandez to install carports and that Jose Ruben Hernandez had hired his own crew. However, the deposition testimony, when considered in the light most favorable to the non-moving parties, indicated that both Ruben Antonio Hernandez and Jose Ruben Hernandez were Eagle approved installers. The evidence concerning Lewis Castillo is less clear. Ms. Collins thought she had heard of Lewis Castillo though she could not explain why, but Mr. Gammons was not familiar with Mr. Castillo. Nevertheless, out of an abundance of caution, the Court concludes for purposes of this motion that each of the three members of the installation crew involved in the April 23, 2004 automobile collision were Eagle approved installers.

*Furnishing Tools and Equipment*

Eagle furnished all the materials which constituted the carport to the installation crew involved in the April 23, 2004 collision. In addition, when viewing the evidence in the light most favorable to the defendants, Eagle also furnished this crew with the trailer which carried the

12

carport materials. On the other hand, Jose Ruben Hernandez owned the truck involved in the collision, and he was also required to have his own insurance on the vehicle and pay for gas himself. The crew also provided its own tools used to install the carports.

*Self-Scheduling of Working Hours and Being Free to Work for Others*

Eagle employees took orders from the dealer and called customers to schedule installation. Customers were not given a particular time or even day for installation. Rather they were told to expect installation during a particular week. Then these employees would either call an installer and ask if they were available or installers would call to let Eagle know they were available. The installer did not have to work a particular run. Sometimes, if no installer was available, installation dates would be changed. The evidence indicates that regardless of whether Eagle called the installers or the installers called Eagle, the installers would inform Eagle whether they were available any given week to install carports in a particular place. Alicia Torres also testified that installers were permitted to work for other companies and some did. There is no evidence as to whether Ruben Antonio Hernandez worked for other companies besides Eagle. However, one may safely deduce that Ruben Antonio Hernandez spent a large amount of his time installing Eagle carports in 2003 as Eagle paid him $119,529.80 that year.

This case is very similar to *Wright v. Knox Vinyl & Aluminum Co., Inc.*, 779 S.W.2d 371 (Tenn. 1989). The plaintiff in *Wright* had applied for worker's compensation following an injury. The defendant was a siding business, and plaintiff installed siding. Sales representatives for the defendant would contract with property owners for the installation of siding. The plaintiff installed siding for the defendant and was paid $35 per hundred square feet and $1.25 for each foot of overhang. The fee was the same though the plaintiff used an assistant. The

13

defendant told the plaintiff what the job required and provided the necessary materials. The plaintiff provided the tools with the understanding that if special equipment was needed, the defendant would furnish it. The plaintiff was free to work for other siding companies but he did not do so. The defendant could terminate the relationship at any time. The defendant gave initial instructions and inspected the work at the end of the job, "but had no control over the methods of the plaintiff's work." *Id*. at 373. Even though the defendant's right to terminate at any time was a "strong factor" in favor of finding the relationship was one of employer-employee, the court found the right to control factor the most important indicator. *Id.* at 374. The court held since the defendant's right to control extended only to the end result, the trial judge did not err in finding the plaintiff an independent contractor. *Id.*

In *Wright* and the instant case, the method of payment, the degree of control the principal had over the job, the right to work for others, and the provision of materials and the use of tools are very much the same. The cases differ in the worker's ability to use unapproved assistants. Based on the evidence presently before the Court and viewing the evidence in the light most favorable to the nonmoving party, I must conclude for purposes of this motion that all members of the installation crew in this case were approved by Eagle. However, no one factor is indicative of employee or independent contractor status. Rather, "characterization of a worker as an employee or independent contractor depends upon an *ad hoc* analysis of the facts." *Masiers v. Arrow Transfer & Storage Co.*, 639 S.W.2d 654, 656-57 (Tenn. 1982).

While "[a]n employee's status is normally a question of fact, ... the employee's status can become a question of law if the facts concerning the employment relationship are essentially undisputed and if they support only one conclusion." *Ascolese v. Misco, Inc.*, 1989 WL 25588

14

(Tenn. Ct. App. 1989) (see also cases cited therein). If one were to look at each indicium of worker status in isolation, one could make the argument that a genuine issue of material fact exists as to Ruben Antonio Hernandez's worker status. However, when considering *as a whole* all the evidence adduced by the nonmoving parties, the evidence of independent contractor status is so strong, in this Court's opinion, as to preclude a reasonable jury from reaching any conclusion other than Ruben Antonio Hernandez was an independent contractor for Eagle at the time of the collision on April 23, 2004. Therefore, the Court will grant Eagle's motion for summary judgement on plaintiff's claim for vicarious liability against Eagle for the negligent conduct of Ruben Antonio Hernandez.

IV. Conclusion

For the reasons stated herein, defendant's motion for partial summary judgment shall be entered on the plaintiff's claim for vicarious liability against Eagle. The plaintiff's claim for negligent entrustment against Eagle remains. An appropriate order shall enter.

s/William B. Mitchell Carter
UNITED STATES MAGISTRATE JUDGE

15